**Jerry ELWOOD, Appellee,**

v.

**ASSOCIATED MILK PRODUCERS, INC., Appellant.**

**No. 46342.**

Court of Appeals of Oklahoma, Division No. 2.

Oct. 29, 1974.

Rehearing Denied Nov. 20, 1974.

Certiorari Denied March 23, 1976.

Released for Publication by Order of Court of Appeals March 25, 1976.

Benjamin E. Butts, Erwin & Butts, Chandler, for appellee.

Donald E. DeSpain, Stuart H. Russell, Inc., Oklahoma City, and James P. Bailey, Dyche, Wright, Sullivan, Bailey & King, Houston, Tex., for appellant.

BACON, Judge.

Appellee is a milk producer and joined appellant organization which acts as a marketing agent for milk producers. In joining appellant's organization, appellee entered into written agreements with appellant, which agreements contained terms as to how much appellant would receive for milk marketed for him and his wife. Exactly what price arrangement to which the parties agreed is the basis of the dispute here, and its solution hinges on a determination of which of two possible agreements was made, that is, either the one we will call the "1968 Plan"—the one appellee contends was made—or the "1970 Plan"— the one appellant says was entered into. More specifically the argument here centers around the price-fixing formula which differs in the two plans.[1]

---

1. Basically milk produced by producers is sold as Class I (for marketing in drinking form), or as Class II (used for making other dairy products). While originally the quality of milk is the same for both classes, the market price for Class II, or excess milk, is less than

Appellee became interested in the dairy industry in late 1969 or early 1970. The purpose for appellant's existence is the stabilization of the milk market through a form of regulation of supply and demand and through a proration of the market for Class I, or Grade A milk among the various producers. Appellee contacted a representative of appellant and was advised that at that time the only way appellee could market Class I milk was to acquire an already allocated Class I base from an existing member, otherwise all his milk would have to be marketed as Class II milk. The representative said however, that appellant would be opening up a plan for new producers in the near future, so appellee acquired his herd (about 60 head at trial time) and began marketing his milk as Class II milk. Appellee subsequently leased a 1402-pound base on April 1, 1970, and began selling the first 1402 pounds of milk produced each day as Class I milk and the rest as Class II milk. Appellant would market appellee's milk and send a check for same after figuring the amount, using the above-mentioned formulas which applied to owners of leased base. Appellee continued to sell milk in this manner until the new plan was adopted. After the new plan was adopted appellee was paid pursuant to the new plan formula, which resulted in less milk being sold as Class I. Appellee then brought the present action seeking a declaratory judgment interpreting these agreements, and recovery of monies he feels he is entitled to under his interpretation of the written agreements.

For an understanding of the issues and propositions raised by appellant, we deem it necessary to set forth some brief background information relative to the milk marketing industry as it applies to the facts of this case.

It was determined some years ago that each producer-member of appellant should share pro rata in the demand for Class I milk, to avoid one member selling all his milk as Class I and another member selling all his milk as Class II. In 1968 a plan was adopted by appellant and in putting this plan into effect, it was finally determined that approximately 70 percent of the milk produced in Oklahoma in 1966 would have been sold as Class I milk. Thereafter it was presumed that 70 percent of the milk produced by each producer would be sold as Class I milk and the remaining 30 percent would be sold as Class II. Each producer was allowed to select his highest 12 calendar months of production during a two-year period encompassing 1966 and 1967. In other words, each producer could select his highest January, his highest February, etc. during this two-year period. After the producer selected his highest 12 months, these months were totaled and divided by 365 to arrive at the producer's average daily production. The 70 percent figure was then applied to this figure which gave the producer the approximate amount of milk that he would sell as Class I milk, and the rest would be sold as Class II milk.

Prior to July 1, 1970, the only way of obtaining base was to have had base allocated under the initial 1968 Plan, or purchase base from an existing member who acquired his base under the 1968 Plan. About January 20, 1970, appellee became a member of appellant and on April 1, 1970, acquired a 1402-pound base by transfer from an existing member.

Over the years appellant came to realize its members were experiencing difficulties in acquiring existing base either to start producing or to enlarge their existing production, and further that the demand for Class I milk was increasing. Thereafter, about April 7, 1970, appellant adopted a "Base Proposal for New and Old Producers," (hereinafter referred to as the 1970

Class I, and therefore a producer prefers to sell all the milk he can as Class I. Since supply and demand of milk fluctuates daily, not all milk produced can be sold as Class I and there is a certain amount of Class II milk. Just how much will be taken from a producer as Class I depends on an established formula.

Plan) which was a plan whereby a new producer could "earn" base and existing producers could "earn" additional base without having to purchase base from a member.

On May 15, 1970, appellant began taking applications from members who desired to participate in the 1970 Plan. Appellee so applied on June 18, 1970, and was accepted by appellant. On July 21, 1970, appellee, fearing his presently owning a 1402-pound base would interfere with his new plan, transferred his 1402-pound base effective August 1, 1970. Under the 1970 Plan a producer could establish a "temporary base" in much the same way as under the 1968 Plan, except under the 1970 Plan the producer would figure his production from September 1970 through February 1971 and divide by 181 (the number of days in that period) which would give the average daily production. Then 70 percent of that figure would give the temporary base, i. e., the amount he could market as Class I milk. This temporary base was subject to adjustment each similar period during the next 60 months as demand increased at which time a "permanent base" would be awarded the producer. If during this period demand did not increase, then of course, the temporary base would not be adjusted upwards.

After appellee was approved under the 1970 Plan a question arose as to whether he could qualify as a "new producer" since he had previously acquired the 1402-pound base. Base owned by a member applying under the 1970 Plan was considered in calculating the amount of temporary base he would receive under the 1970 Plan. In appellee's case, the amount of temporary base he could have established would have been reduced a great deal if consideration were given to the 1402-pound base that he had purchased. Appellee requested and was granted an exemption from this computation requirement, so that when he transferred his 1402-pound base, this figure was not used in calculating what his temporary base would be. Appel-

lee, like all other producers, received a Class I price on 70 percent of the milk he produced from September 1970 through February 1971, which was the time period for establishing his temporary base. On March 1, 1971, appellee's temporary base had been established and he was thereafter paid Class I price for 70 percent of his average daily production or temporary base established during the September 1970 to February 1971 temporary-base-establishing period.

On September 29, 1971, appellee's attorney appeared before the Oklahoma Division Base Committee of appellant and requested appellee be allowed to sell 70 percent of all the milk he produced over the five-year or sixty-month period previously referred to, prior to being awarded a permanent base, apparently in lieu of selling his milk according to the temporary base established from September 1970 through February 1971. The committee took no action, which in effect was a denial of appellee's request. Appellee was advised of his automatic right to appeal the "no action" decision to the "Supply-Management Committee for the Southern Region" of appellant, as was provided for in the "Rules of Practice and Procedure of Supply-Management Committee, Associated Milk Producers, Inc." Instead of so appealing, the next action taken by appellee was to file the present action in district court seeking declaratory relief and a judgment for the difference in the amount appellee received figured by appellant on the temporary base established by appellee (and not adjusted) during the September 1970 through February 1971 period, and the amount appellee would have received had he been paid Class I price on 70 percent of *all* the milk he produced after March 1, 1971, when the temporary base had been established.

The case was tried to the court without a jury and the trial court found in favor of appellee and against appellant. Appellant filed its motion for new trial which was overruled and appellant now appeals.

■ Appellant's first proposition reads as follows:

"The trial court erred in refusing to dismiss plaintiff's case, since plaintiff has not exhausted his administrative remedies provided by defendant association."

In this regard, appellant directs our attention to its "Rules of Practice and Procedure of Supply-Management Committee Associated Milk Producers, Inc.," which states a producer receiving an adverse decision "shall have the absolute right of appeal" to the MPI Regional Supply-Management Committee.[2] Appellant takes the position that since appellee did not appeal the "no action" decision of the Oklahoma Division Base Committee under the above-cited rules of procedure, he could not go into district court. Appellant cites *Taxicab Drivers' Local Union No. 889 v. Pittman,* Okl., 322 P.2d 159 (1957) and *Torbett v. Internat'l Typographical Union,* Okl., 508 P.2d 268 (1973) as authority to support its argument.

We do not agree with appellant's argument for several reasons. First, the quoted rules provide appellee "shall have the absolute right of appeal," not that appellee *must* appeal to the MPI Regional Supply-Management Committee. Second, it seems novel for one party to a contract to have to allow the other party to the contract to "adjudicate his rights under the agreement" prior to going into court to determine his rights and/or liabilities. Third, we note at least one person sitting on the Oklahoma Division Base Committee (which appellee's attorney appeared before and from which appellee received the "no action" decision) is also a member of and sits on the Regional Supply-Management Committee to which appellant says appellee must appeal prior to going into district court—even though the Committee member testified he would probably have disqualified himself from hearing the appeal.

Last we think *Pittman* and *Torbett* are not controlling in the present case. The Pittman case was one involving an action brought by a member of a labor union because of the latter's causing him to be suspended from his job. The union argued

---

2. "2. Each member of AMPI receiving an adverse decision from any Division Supply-Management Committee shall have the absolute right of appeal of such determination to the MPI Regional Supply-Management Committee.

"(a) No particular form of an appeal shall be required, but the request for such review mus be made in writing and must be filed within fifteen (15) days of receipt of the notice provided for in Paragraph II, Item 7, above and addressed to the AMPI Supply-Management Committee, G. P. M. Life Building, 4th Floor, San Antonio, Texas, 78216, with notice being given to the Division office.

"(b) Upon receipt of a written request for such an appeal, the Regional Supply-Management Committee shall cause notice of the date, time, and place of the appeal hearing to be given promptly to the member-producer and to the Division Advisory Board.

"(c) The Division shall cause the entire record of the proceedings and the initial determination by the Division Supply-Management Committee to be transmitted promptly to the AMPI Regional Supply-Management Committee, G. P. M. Life

Building, 4th Floor, San Antonio, Texas, 78216.

"(d) The member-producer and the Division Supply-Management Committee shall be given at least five (5) days advance notice in writing of the time, date, and place of the hearing on this appeal by the AMPI Regional Supply-Management Committee.

"(e) The notification to the member-producer shall include a notice to the effect that he may have his appeal considered on the basis of the record made before the Division Supply-Management Committee only, or on the basis of such record and his appearance before the AMPI Regional Supply-Management Committee in person and by an authorized representative if he so chooses.

"(f) The AMPI Regional Supply-Management may approve, disapprove or modify any determination of a Division Supply-Management Committee, and any such decision shall be binding on the Division.

"(g) No relevant information not submitted to the Division Supply-Management Committee shall be received or considered by the AMPI Regional Supply-Management Committee in such a hearing on appeal.
. . . ."

that under its constitution the member had to first pursue his remedies within the association prior to going into court. The Oklahoma Supreme Court acknowledged there is a general rule that one must exhaust his administrative remedies without saying when this is so, and then found no merit to the argument and said, ". . . [I]n the view we take of the action, *the exhaustion-of-remedies rule has no application.* . . . The point here is not that he must exhaust his union remedies; the point is whether he was in 'bad standing' with his Local Union at the time he was suspended from work at the request of the defendants." (emphasis ours) We think this case does not support appellant's argument because the case does not apply or explain the exhaustion of administrative remedies rule, but only acknowledges it does exist, and we will not search the authorities for the rule and its exceptions. We therefore find this case is no help in deciding whether appellee had to seek his appeal before the Regional Supply-Management Committee prior to going into district court.

In *Torbett* there was a dispute between a union and one of its members involving the payment of pension benefits. The member did not appeal to the union's International Convention from an adverse decision of the Executive Council as provided in the union's rules and regulations prior to going to court. Exhaustion of administrative remedies was raised by the union but the supreme court found that exhausting administrative remedies would have been futile, and requiring it would result in a "practical denial of justice" because of (1) the union's arbitrary and capricious rejection of the member's pension application; (2) the member would have to present his appeal in Miami, Florida; and (3) the unusual costs of pursuing his administrative appeal. In the present case, first, it *was not* provided in the rules and regulations of appellant that a member *must* appeal, but only stated he had the automatic right to appeal. Second, a "no action" decision could easily be construed to be an arbitrary and capricious rejection of appellee's request. Third, while appellee could appeal by letter, if he wanted to appear, he would have to travel to whatever city the Regional Supply-Management Committee chose to hold the hearing in, in addition to paying his attorney's fees, and expenses to that hearing. Under these circumstances, and because of the other reasons previously set forth herein, we cannot find the trial court erred in holding appellee need not first appeal to the Regional Supply-Management Committee, prior to going into district court seeking an adjudication of his rights and/or liabilities.

■ Appellant's second proposition reads as follows:

"The judgment of the trial court is contrary to the evidence and law in this cause."

Appellant argues that the trial court's judgment is unsupported by any evidence and based upon erroneous conclusions of law "in construing the agreement in question between the parties." Appellee was awarded damages on the second cause of action and we may therefore assume the trial court found the 1968 Plan determined appellee's rights in regard to base acquisition, because appellant had used the 1970 Plan in computing the monies already paid to appellee. In other words, to support appellee's theory, the trial court had to have found the 1968 Plan, which contained the provisions under which appellee claims his sales should be calculated,[3] was applicable.

---

3. "A—General Provisions

"9. At the option of any Division Board of Directors in the MPI Region, the Division Base Committee may issue base to a new producer according to the following procedure and specifications:

"a. For new producers beginning deliveries of Grade A milk to be marketed by AMPI, MPI Region, on or after May 1, 1968: For the first sixty months of deliveries said producer shall be paid the division base price less 25¢ per hundredweight for the quantity calculated by multiplying his

To support appellant's theory it would have to be found that the 1970 Plan would apply in calculating appellee's base, hence the amount to be paid appellee.[4]

pounds of total deliveries each month by such percentage, not to exceed the existing division base allocation percentage, as may be prescribed by the Supply-Management Committee. The remainder of his deliveries shall be paid for at the division over-base price. Beginning with the sixty-first month of deliveries (and not before), said producers shall then be issued permanent transferable base determined and calculated by multiplying said initial sixty month average daily deliveries by a percentage not to exceed the division base allocation percentage. As used herein, a new producer is a producer beginning deliveries of Grade A milk to AMPI, MPI Region, on or after May 1, 1968, and one who has not transferred any MPI Region Base within five years prior to beginning such deliveries.

"b. For nonmember producers as of August 1, 1969, base may be issued upon such producer becoming a member of AMPI, MPI Region, in the following manner:

(1) If such producer has a production history for the years 1966–1967, and is currently participating in Class I sales, such producer may be granted base not to exceed his division allocation percentage and such base shall not be transferable for a period of two years from and after the date of issue.

(2) An existing nonmember producer beginning deliveries on or after January 1, 1968, and prior to August 1, 1969, and who is currently participating in Class I sales, may be issued base calculated by applying the division base percentage to his first sixty days' deliveries. Said base shall not be transferable for a period of two years from and after the date of issue.

(3) Permanent nontransferable base may be issued to the above two categories of nonmember producers becoming members of AMPI, MPI Region, to be determined as follows:

Said member may be issued, in addition to the above transferable base, nontransferable base determined by multiplying his average daily deliveries for the most recent twelve months, or for such lesser period that he was on the market immediately preceding his membership in AMPI, MPI Region, times the division base allocation percentage and calculating the amount if any, by which such resulting poundage exceeds the pounds of permanent transferable base to which he is entitled as above provided in Paragraphs 9(b)(1) or 9(b)(2).

"c. Existing nonmember producers, who start Grade A milk deliveries on or after August 1, 1969, upon becoming a member of AMPI, MPI Region, may be issued base, either transferable or nontransferable, as determined by the AMPI, MPI Region Supply-Management Committee, and approved by the AMPI, MPI, Region Board of Directors, at the request of any Division Board of Directors."

4. "This new allocation would be made to producers, who upon proper application, could qualify for relief by taking that volume of milk produced in September, October, November, December, January and February, beginning with September, 1970 and six month period beginning with each September thereafter that was in excess of the result of dividing the individual producers base by 70 and multiplying by 100. Should a producer have a history of having transferred his base and subsequently reducing his base account, the highest base held for his account shall be used as the base in this formula to establish the milk eligible for determination of temporary base. This total eligible milk shall then be divided by 181 (total number of days in qualifying period, except 182 in leap years). This result shall then be multiplied by 70% to establish additional temporary base. This temporary base is subject to adjustment each month of each requalification period.

"For sixty (60) consecutive months, this adjustment shall be the formula as defined and recalculated in the requalification periods. "The method to be used for accounting and pay purposes are [sic] as follows:

1. Divide permanent base by 70 and multiply by 100 and the number of days in the pay period.
2. Subtract this figure from the producer receipts for the pay period.
3. Take the result obtained from step one and two. This volume (70%) then will represent the milk eligible for use as temporary base deliveries.
4. The beginning pay period shall be September, 1970.
5. The temporary base price shall be the division payment area base price less .25¢ cwt.

"So that equity may be preserved between these producers and producers having obtained base by transfer, this base shall not become allocated base until after sixty (60) consecutive months from the beginning of applicant's first month of requalification. In no event will base be allocated on a pro-rated basis for the term of sixty (60) months. Each allocation, using this provision, will be made only in the event of sixty (60) consecutive months of participation in this pro-

After briefing and oral argument it is clear the issue for us to decide is which plan or plans was appellee attempting to come under when he made his 1970 application. Appellee urges that Section A(9) of the 1968 Plan had provisions for becoming a new producer and that such provisions had never been implemented prior to 1970. Appellee urges that he was therefore applying as a new producer under the 1968 Plan and urges appellant put these never-before-used provisions into effect by adopting the 1970 Plan. Appellant however, says no, it was adopting an entirely new plan for new producers when it adopted the 1970 Plan. To support appellee's claim that the 1968 Plan applies, we find in the record appellee's application dated June 18, 1970, which specifically says in the typed part that he is applying under the 1968 Plan.[5] Had it stopped there, we would have no problem since appellant accepted the application. However, following the typed part is a handwritten provision which indicates appellee was trying to come within the 1970 Plan.[6] Such would then cause the application to be ambiguous which would require us to look beyond the four corners of the application to ascertain under which plan appellee was in fact applying.

Appellee's contention is that the 1968 Plan contains the plan for the entire AMPI and that it does not authorize any alteration by the Divisions. First, as appellant points out in its brief, the 1968 Plan is not a plan for the national association, but specifies that it is meant for the MPI Region of the AMPI. The AMPI apparently consists of regions composed of divisions. The Oklahoma association is a division of the MPI Region. So it is certain that the changes in the 1968 Plan do

---

vision. Base allocated in this manner, by the Division Base Committee, is subject to the two (2) year non transferable clause as outlined in the base plan.

"The Base Committee shall use the total eligible milk each year as the maximum limits for this provision and shall continually review total production and its relationship to eligible milk.

"This proposal was presented to the Oklahoma Division Advisory Board, at its regular meeting Tuesday, April 7, 1970, and approved for immediate implementation."

5. "Base Committee
Oklahoma Division, AMPI
Route 4 Box 22G
Oklahoma City, Oklahoma
Gentlemen:

As a new producer, as defined in the MPI Class I Base Plan, I hereby make application to build a base and to participate in the new producer clause as outlined in Section A, Item 9, of the base plan.

| | |
|---|---|
| Producer # | 3062 |
| Date of Membership | March 6 |
| Current Base | Leased 1402 lbs. |
| Date of Application | June 18 |
| Signature | s/ Jerry Elwood |
| Approved | [Check mark] |
| Denied | |
| Chairman | s/ W. R. Griffith Cmr |
| Date | 6-25-70 |

---

6. "We are a new producer. We began milking in March selling Class II milk.

"The first of April, we contacted Jiggs Wiese [sic] to ask if leasing Base would make us ineligible when the new Producer Plan is passed. He assured us that it would not hurt us in any way. So we rented 1400 lbs. . . .

. . . .

s/ Mr. & Mrs. Jerry Elwood"

not have to originate with the national AMPI when the plan itself originated at the Regional level. However, aside from this, we find nothing that supports appellee's claim that alterations in Section A(9) of the 1968 Plan must come directly from AMPI.

This section, the very one appellee says provides the exclusive method for allocating base to new producers, precedes its plan by stating, "*At the option of any Division Board of Directors* in the MPI Region, the Division Base Committee *may* issue base to a new producer according to the following procedure and specifications . . . ." (emphasis ours) The intent seems clearly to be that the final base determination method should be up to the Division level, limited by the Regional plan, which seems most logical in a multi-area marketing cooperative. The Oklahoma Division Board apparently did, for reasons expressed in the 1970 Plan, vary the procedure.

An AMPI director testified that *each division* within the MPI Region had in fact adopted a different plan for dealing with new producers and that he was present when the 1968 Plan was adopted and understood it was "a limitation—they could impose a forty-eight month, they could set a six-month seasonal factor, they could limit in terms of number of pounds . . . . Or they could, as a matter of fact, not open up a plan at all."

We find nothing that appeared to allow only the AMPI to alter the 1968 Plan.

Is then the 1970 Plan *inapplicable*, as appellee claims, by virtue of its being adopted for hardship cases only and not for new producers? This is almost a matter of semantics. The 1970 Plan, by its very title applicable to both old and new producers, begins by explaining three basic categories: (1) producers who, due to accelerated growth during the base setting period, acquired insufficient amount of base, (2) new producers, and (3) producers faced with a need to expand but unable to borrow sufficient capital for equipment, herd and base. All three groups, it notes, are limited by the capital requirements of purchasing base, therefore "the Oklahoma Division Hardship Committee determined that a hardship did exist in these particular categories." And in order to determine which producers would be entitled to utilize this method (rather than purchase base), the proposal includes any producer "with less than 70% of their production, (new producers % would be zero) as base milk."

We think that if one accepts the fact that the 1970 Plan is a valid, authorized, plan it must be recognized that it is, in fact, *the* plan for new producers in the Oklahoma Division because the Division has in effect designated new producers as "hardship cases." It would appear that the 1968 Plan is not in effect in the Oklahoma Division and new producers, as well as any old producer with less than 70 percent base, must either acquire base in accord with the 1970 Plan or else purchase base. Such seems to lend much support to appellant's position.

The issue is a close and difficult one. We think the trial court had to give exceedingly great if not total weight to the printed reference to the 1968 Plan on appellee's application to the exclusion of the Elwoods' explicit explanation to the contrary on the same document. This fact coupled with all other facts and circumstances leads to the conclusion that appellee applied for and received approval for marketing his production under the 1970 Plan formula.

Once appellee transferred his 1402-pound base, the only way he could acquire base would be to acquire it by transfer under the old 1968 Plan, or earn or build it under the new 1970 Plan.

As we said earlier the only evidence in the record to support a finding appellee intended to come under the 1968 Plan in filing his application in 1970 was printed matter in the application referring to the 1968 Plan. That the wrong form was used

seems evident from the corrective specifics written on the application by the hand of Mrs. Elwood, which when considered with the time of filing, the transfer of base he had and the other circumstances described herein, leads us to the conclusion appellee asked to be and is controlled by the 1970 Plan. *Farmer v. Trepp*, Okl., 376 P.2d 596 (1962).

We find the trial court erred in rendering a money judgment for appellee. Therefore, discussion of appellant's last proposition which challenges the correctness of the amount of damages is unnecessary.

Reversed and remanded to the trial court with directions to enter judgment for appellant.

BRIGHTMIRE, P. J., and NEPTUNE, J., concur.